IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION



| | | |
|---|---|---|
| DENNIS WALSH, individually, and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 5:17-cv-00010 RCL |
| RANDOLPH BROOKS FEDERAL CREDIT UNION, and DOES 1 through 100, | § § § | (Class Action) |
| Defendants. | § § § | Judge Assigned: Hon. Royce C. Lamberth |

## FIRST AMENDED COMPLAINT

Plaintiff Dennis Walsh ("Plaintiff"), by his attorneys, hereby brings this class and representative action against Randolph Brooks Federal Credit Union ("RBFCU" or "Defendant"), and for his causes of action respectfully pleads as follows:

## NATURE OF THE ACTION

1.    All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or his counsel. Allegations pertaining to Plaintiff or his counsel are based upon, inter alia, Plaintiff or his counsel's personal knowledge, as well as Plaintiff or his counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.    This is a class and representative action brought by Plaintiff to assert claims in his own right, and in his capacity as the class representative of all others persons similarly situated, and in his capacity as a private attorney general on behalf of the members of the general public. RBFCU wrongfully charged Plaintiff and the class member overdraft fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to RBFCU's policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft fees breaches RBFCU's contract with its customers, who include Plaintiff and the members of the Class.

## PARTIES

4.      Plaintiff is a resident of Guadalupe County, Texas, and was a member of RBFCU at all times relevant to the class action allegations.

5.      Based on information and belief, Defendant RBFCU is a federally chartered credit union with branch offices located throughout the San Antonio, Texas area, including at least two branch offices in Guadalupe County, Texas.  Based on information and belief, RBFCU also has branch offices in Illinois.

6.      Without limitation, defendants Does 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of RBFCU and, upon information and belief, also own and/or operate RBFCU branch locations.  As used herein, where appropriate, the term "RBFCU" is also inclusive of Defendants Does 1 through 100.

7.      Plaintiff is unaware of the true names of defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants Does 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

8.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including Does) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are alter egos in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

9.      At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and

course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

11.     As to the conduct alleged herein, each act was authorized ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

12.     Although this Court may maintain supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. 1367, this Court no longer has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as there is no longer a federal question at issue.[1]

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     RBFCU's Unlawful Charges of Overdraft Fees**

14.     RBFCU is a credit union with over fifty branch offices throughout the San Antonio and Austin, Texas areas, holding approximately $7.1 billion in assets. RBFCU offers its consumer banking customers a checking account. One of the features of a RBFCU checking

---

[1] Plaintiffs also note that there is no diversity jurisdiction pursuant to 28 U.S.C. § 1332 since both Plaintiff and Defendant are citizens of the same state of Texas, all of the putative class members' accounts are held in Texas, and at least two-thirds of all putative class members are citizens of Texas.

account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a RBFCU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

15.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), RBFCU assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

16.    Overdraft fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as RBFCU, overdraft fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6 to 7% of the gross revenue of credit unions.  (Filene Research Institute Report, Overdraft Regulation A Silver Lining In The Clouds?  Filene Research Institute 2010).

17.    The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

18.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25 year-old is 133% more likely to pay an overdraft penalty fee than a 65 year-old.  (*Id*. at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

19.     As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[2]

20.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

21.     To qualify as affirmative consent, the opt-in agreement must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that may be charged per day;

- The opt-in consent must be obtained separately from other consents and

---

[2]

http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_ Rulemaking.pdf , at p. 74-75.

acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

- The financial institution must explain that a line of credit or other service that transfers funds from another account to cover the overdrafts is available as an alternative to the financial institution's own payment of overdrafts, if the financial institution in fact offers that alternative.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

22.     At all relevant times, RBFCU has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contracts with members; (2) contrary to RBFCU's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

23.     Under RBFCU's contracts with its members, RBFCU has promised that it will only assess an overdraft fee against an account when RBFCU pays a transaction that results in a negative balance for that account.

24.     RBFCU entered into a written contract with Plaintiff and its other customers titled "About Your Credit Union Deposit Accounts" (hereinafter referred to as the "Account Agreement").  Under the Account Agreement, RBFCU is entitled to assess an overdraft fee only when there are insufficient funds in a customer's account to pay for a transaction, and RBFCU advances its funds to complete the transaction.

25.     RBFCU entered into a second agreement with Plaintiff and the class members (the opt-in agreement required by Regulation E that RBFCU provided to Plaintiff and the class

members), which governs the terms under which RBFCU may assess Plaintiff and the class members overdraft fees for ATM and non-recurring debit card transactions, and provides them with several means to accept those terms, and which is referred to herein as the Opt-In Agreement.  Because the Opt-In Agreement does not describe RBFCU's actual overdraft service, the Opt-In Agreement fails to comply with the requirements of Regulation E.  The Opt-In Agreement nonetheless contains promises to which RBFCU is contractually bound.  In the Opt-In Agreement, RBFCU promised that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  This promise meant that RBFCU is not authorized to assess an overdraft fee—because an overdraft has not occurred— unless there is not enough money in the customer's account to cover the transaction.

26.    As used herein, the Account Agreement and the Opt-In Agreement are hereinafter collectively referred to as the "Customer Agreements."  RBFCU's contractual promise in its Customer Agreements to assess overdraft fees only when there is not enough money in the account to cover the item was also repeated to customers in other disclosures and marketing materials.  RBFCU also promises in the Customer Agreements and marketing materials that it will not assess overdraft fees on ATM and non-recurring debit card transactions against any customer who does not "opt-in" to the overdraft service.

27.    However, directly contrary to this promise, RBFCU's policy and practice is to ignore whether there is money in the account or a negative balance.  Instead, RBFCU's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation called the available-balance method rather than the ledger-balance method.

28.    The available balance is not the customer's actual balance (ledger balance). Rather, it is the actual balance of a customer's account (ledger balance) *minus* anticipated future debits (debits that may or may not occur) and *minus* credit holds. Not only is the practice of using the available-balance method rather than the ledger-balance method to determine whether a transaction results in an overdraft and thus is subject to an overdraft fee directly contrary to

RBFCU's Opt-In Agreement, but such practices have resulted in RBFCU improperly charging, and continuing to charge its members, including Plaintiff and the members of the Class, unlawful overdraft fees. Whether a financial institution uses the ledger-balance method versus the available-balance method is a primary concern for the Consumer Financial Protection Bureau ("Bureau") due to the substantial harm it causes to customers. As the Bureau concluded from its studies of actual financial institutions in its Supervisory Highlights, Winter 2015, at p.8[3]:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method.

When the balance calculation method is not adequately disclosed, the Bureau has found the use of the available-balance method instead of the ledger-balance method a deceptive practice, as it results in "customers being misled" because this information is "material to a reasonable consumer's decision-making and actions", and consumers are thereby "substantially injured". (*Id*. at p. 9.)

29.    RBFCU's practice of charging overdraft fees, even when there is money in the account to cover a transaction presented for payment, is inconsistent with how RBFCU expressly describes the circumstances under which overdraft fees are assessed in its Customer Agreements. Further, RBFCU has failed to inform its customers, including Plaintiff and the members of the Class, of the conditions under which overdraft fees will be assessed in the Customer Agreements.

---

[3] http://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf

30.    RBFCU has violated Regulation E by charging Plaintiff and the class members overdraft fees.  Because the Opt-in Agreement states that overdraft fees will be assessed only when there is not enough money in the account to cover the transaction at issue, it does not describe RBFCU's actual overdraft service.  Consequently, RBFCU was not authorized to charge Plaintiff and the class members overdraft fees on ATM and non-recurring debit card transactions because they do not provide an accurate "brief description of the financial institution's overdraft services" as required by Regulation E's Opt In Rule.

31.    Alternatively, RBFCU has also violated Regulation E by failing to provide its customers with a separate opt-in disclosure as required by Regulation E, and by failing to provide its customers with the opportunity to actually opt-in or opt-out of the overdraft program for ATM and non-recurring debit card purchases.  RBFCU has opted-in Plaintiff and the class members without obtaining their consent to do so as required by Regulation E.

32.    The importance of Regulation E is highlighted by the fact that the Bureau's study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[4]

33.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

34.    Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods.  The ledger balance is the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.

35.    Further, based on information and belief, it is the balance used by RBFCU to

---

[4] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

report its deposits to regulators, shareholders and the public.  It is the deposit balance provided to regulators in call reports and reserve reports.  It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of RBFCU.

36.    When RBFCU refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the ledger balance.  In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the ledger balance and not the available balance, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive."  The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)."  (Supervisory Highlights, Winter 2015, at p. 9.)

37.    Therefore, Plaintiff, on behalf of himself and all others similarly situated, seeks relief as set forth below.

**B.    Unlawful Overdraft Fees Assessed to Plaintiff**

38.    Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in his account to cover the transaction.  Plaintiff entered into two agreements with RBFCU, herein identified as the Customer Agreements, wherein RBFCU contracted to charge overdraft fees on certain transactions only if his account did not have money to cover the transaction.  By nonetheless charging Plaintiff overdraft fees, RBFCU breached its contracts with Plaintiff and violated Regulation E.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee.  However, to give one example, on January 7, 2016, Plaintiff had a positive balance of $29.13 in his checking account when he made a point of sale debit card payment of $10.81, leaving him with a positive balance of $18.32.  Despite the fact that Plaintiff had sufficient funds in his account to cover the transaction, RBFCU assessed a $24.00 overdraft fee against his account.  Plaintiff has a

reasonable belief that a complete review of Plaintiff's and RBFCU's records will show multiple instances in which RBFCU improperly charged Plaintiff overdraft fees for transactions despite the fact that Plaintiff had enough money in his account to cover the transactions.

39.     Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which RBFCU assesses further overdraft fees. For instance, Plaintiff's January 7, 2016 overdraft fee resulted in two additional $24 overdraft fees that would not otherwise have taken place, as a result of subsequent charges of $5.08 and $8.00. This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly

disclose the practice of charging overdraft fees in these circumstances was

deceive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)  A complete evaluation of RBFCU's

records is necessary to determine the full extent of Plaintiff's harm from this practice.

40.    Plaintiff was harmed by this practice when he was assessed overdraft fees for

nonrecurring debit card and ATM transactions.  As noted, Plaintiff's records indicate that on

January 7, 2016, Defendant assessed a $24 overdraft fee against Plaintiff due to a point of sale

nonrecurring debit card transaction.  A complete evaluation of RBFCU's records is necessary to

determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

41.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

42.    Plaintiff brings this case, and each of his respective causes of action, as a class

action pursuant to Rule 42 of the Texas Rules of Civil Procedure on behalf of the following

class.

43.    The "Class" is composed of:

**All Texas residents who have or have had accounts with RBFCU who**

**incurred an overdraft fee or overdraft fees when the ledger balance in the**

**checking account was sufficient to cover the transaction or transactions at**

**issue during the period which begins four years preceding the filing of this**

**Complaint and ends on the date this Class is certified.**

44.    Excluded from the Class is: (1) any entity in which Defendant has a controlling

interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned

to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class

members.

45.    This action has been brought and may be properly maintained on behalf of each

member of the Class under Texas Rule of Civil Procedure 42.

46.     **Numerosity of the Class** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that RBFCU has approximately $7.1 billion in assets and operates over fifty branches throughout the state of Texas.

47.     Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of RBFCU's customers have been harmed by its practices and thus qualify as Class members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

48.     **Commonality**– This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class members include, but are not limited to, the following:

> a.     Whether, pursuant to the Customer Agreements, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

> b.     Whether Defendant breached the Customer Agreements by assessing overdraft fees for transactions when customers' checking accounts contained enough money to cover the transactions;

> c.     Whether the language in the Opt-In Agreement— "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."—described Defendant's overdraft service

pursuant to which Defendant assessed overdraft fees using an available-balance method instead of a ledger-balance method;

d.      Whether Defendant adopted a policy or system whereby customers were not provided an opportunity to opt-in or opt-out of the overdraft program for non-recurring debit card and ATM transactions; and

e.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received.

49.    **Typicality**– Plaintiff's claims are typical of all the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Customer Agreements, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and all Class members.  Accordingly, in pursuing his own self-interest in litigating his claims, Plaintiff will also serve the interests of the other Class members.

50.    **Adequacy**– Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.   There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and his counsel intend to prosecute this action vigorously.

51.    **Predominance and Superiority**– The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class members are relatively small,

-14-

the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

52.    Plaintiff is not aware of any separate litigation instituted by any of the class members against Defendant. Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class members and that he will adequately represent the Class. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. This particular forum is a desirable forum for this litigation because Plaintiff resides in Guadalupe County, Texas, Defendant operates branch offices in Guadalupe County, Texas, and the claims arose from activities which occurred in Guadalupe County, Texas.

53.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members. Upon information and belief, Defendant's

own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

54.    This matter is properly maintained as a class action, in that:

a.    Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

1.    Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

2.    Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b.    Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1.    The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2.    The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3.    The desirability or undesirability of concentrating the litigation of

-16-

the claims in the particular forum; and

4.    The difficulties likely to be encountered in the management of a
class action.

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract)**

55.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

56.    Plaintiff and each of the Class members entered into two contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Customer Agreements.  Each of the Customer Agreements was drafted by and is binding upon Defendant.

57.    In the Customer Agreements, Defendant promised that RBFCU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

58.    The Customer Agreements incorporated by reference all applicable laws regarding their subject matter.

59.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Customer Agreements, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

60.    Defendant breached the express terms of the Customer Agreements by, inter alia, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

61.    As a proximate result of Defendant's breach of the Customer Agreements, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## **SECOND CAUSE OF ACTION**

### **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

62.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

63.    Plaintiff and each of the Class members entered into two contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Customer Agreements.  Each of the customer agreements was drafted by and is binding upon Defendant.

64.    In the Customer Agreements, Defendant promised that RBFCU would assess overdraft fees for ATM and debit card transactions only when there was not enough money in the account to cover the transaction.

65.    Further, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

66.    The material terms of each of the Customer Agreements also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the Customer Agreements.

67.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Customer Agreements, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

68.    Defendant breached the implied covenant of good faith and fair dealing based on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to provide an accurate statement of its overdraft program for non-recurring

debit and ATM transactions, and failing to permit its customers to choose whether to opt-in to the overdraft program for non-recurring debit and ATM transactions. In so doing, Defendant executed a contractual obligation in bad faith, depriving Plaintiff and the Class members of the full benefit of the contract.

69.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

70.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

71.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

72.    The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices. (CFPB Bulletin 2013-07[5], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given

---

[5] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

73.    Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly.   Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.   Should it be allowed to retain such funds, Defendant would be unjustly enriched.   Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

**FOURTH CAUSE OF ACTION**

**(Money Had and Received)**

74.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

75.    Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

76.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members.   Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

**PRAYER**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For an order enjoining the wrongful conduct alleged herein;

5.      For costs;

6.      For pre-judgment and post-judgment interest as provided by law;

7.      For attorneys' fees under the customer agreements, the common fund doctrine, and all other applicable law; and

8.      For such other relief as the Court deems just and proper.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiff and the Class members demand a trial by jury on all issues so triable.


Dated: February 8, 2017                    Respectfully submitted,


                                           */s/ Dean Gresham*
                                           Bruce Steckler, Texas Bar No. 00785039
                                           Dean Gresham, Texas Bar No. 24027215
                                           STECKLER GRESHAM COCHRAN
                                           12720 Hillcrest Road, Suite 1045
                                           Dallas, Texas 75230
                                           Phone: (972) 387-4040
                                           Fax: (972) 387-4041

                                           Richard D. McCune, CA Bar No. 132124*
                                           rdm@mccunewright.com
                                           Jae (Eddie) K. Kim, CA Bar No. 236805*
                                           jkk@mccunewright.com
                                           McCUNE WRIGHT AREVALO, LLP
                                           3281 E. Guasti Road, Suite 100
                                           Ontario, California 91761
                                           Telephone: (909) 557-1250
                                           Facsimile: (909) 557-1275

                                           Taras Kick, CA Bar No. 143379*
                                           Taras@kicklawfirm.com
                                           Robert J. Dart CA Bar No. 264060*
                                           Robert@kicklawfirm.com
                                           THE KICK LAW FIRM, APC
                                           201 Wilshire Boulevard
                                           Santa Monica, California 90401
                                           Telephone: (310) 395-2988
                                           Facsimile: (310) 395-2088

*Pro Hac Vice* applications to be submitted.

Attorneys for Plaintiff Dennis Walsh
and the Putative Class

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and correct copy of the foregoing was filed on **February 8, 2017** with the Court's ECF System which delivers an electronic copy to all counsel of record, as listed below, who are registered to receive ECF notices in this Action.

| | |
|---|---|
| Michael W. O'Donnell | Richard D. McCune |
| Mike.odonnell@nortonrosefulbright.com | rdm@mccunewright.com |
| Jeffrey A. Webb | Jae (Eddie) K. Kim |
| Jeff.webb@nortonrosefulbright.com | jkk@mccunewright.com |
| NORTON ROSE FULBRIGHT U.S., LLP | McCUNE WRIGHT AREVALO, LLP |
| 300 Convent Street, Suite 2100 | 3281 E. Guasti Road, Suite 100 |
| San Antonio, Texas 78205 | Ontario, California 91761 |

**Attorneys for Defendant**

Taras Kick
Taras@kicklawfirm.com
Robert J. Dart
Robert@kicklawfirm.com
THE KICK LAW FIRM, APC
201 Wilshire Boulevard
Santa Monica, California 90401

**Attorneys for Plaintiff**

*/s/ Dean Gresham*
Dean Gresham